**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO.  8:10CV34** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **$22, 0000.00 IN UNITED** | ) | **FINDINGS OF FACT AND** |
| **STATES CURRENCY,** | ) | **CONCLUSIONS OF LAW** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| **JERRY CATO, II,** | ) | |
| | ) | |
| **Claimant.** | ) | |

This matter was tried to the Court on November 9, 2010.  The Claimant, Jerry Cato, II, was represented by retained counsel.  The case was submitted after trial.

## FINDINGS OF FACT

1. On Saturday, September 5, 2009, Omaha Police Department Officer Aaron Hanson, a certified K-9 officer, stopped a Jeep Cherokee driven by Jerry Cato, II ("Cato"), for following the vehicle in front of him too closely.

2. The vehicle driven by Cato was registered to Cato's mother, Rosalee Cato.

3. The only passenger in the vehicle was Elisha T. Williams.

4. When Officer Hanson made contact with the occupants at the passenger side window, he smelled cigarette smoke and felt intense heat coming from the passenger compartment.  Officer Hanson found the heat odd due to the fact that it was a warm day, with temperatures in the 80s.

5. Officer Hanson told Cato why he stopped him, and Cato acknowledged that the distance he was traveling behind the preceding car was neither his normal practice nor a safe distance.

6. Officer Hanson requested and received Cato's driver's license and registration. Officer Hanson asked Cato to exit the vehicle to meet with him behind the vehicle.

7. Officer Hanson asked Cato questions about his itinerary, and Cato said he was going from Galesburg, Illinois, to Lincoln, Nebraska, for his cousin's wedding. He did not know the exact date of the wedding, only that it was after Labor Day.

8. Cato's driver's license showed a Galesburg, Illinois, address.

9. Officer Hanson returned to Cato's vehicle to verify the VIN number. While doing so, he spoke with Williams, Cato's girlfriend. She said that she and Cato were going to Nebraska for a wedding for a couple of days and said the trip was a surprise for her. She did not know the name of the city where the wedding would take place. She said the wedding, which would be on Tuesday, was for a friend of Cato's, whom she did not know.

10. Cato's recollection of his one prior criminal offense generally conformed to the data check ordered by Officer Hanson, although Cato characterized the offense as a misdemeanor domestic violence offense, and Officer Hanson's inquiry led him to conclude that it was a felony assault.

11. Officer Hanson gave Cato a warning ticket for following too closely, and he returned Cato's driver's license and registration. Officer Hanson thanked Cato for his cooperation and asked if he would answer a few questions. Cato said he would rather be on his way.

12. Officer Hanson told Cato a drug dog would be deployed around the vehicle.

13. When Officer Hanson asked Cato if he used controlled substances, Cato said he used drugs recreationally when he not at work.

14. Officer Hanson approached the vehicle to tell Williams that he would deploy a drug dog around the vehicle. When asked if she used controlled substances, Williams responded, "I hit it." Officer Hanson understood the phrase to be street slang meaning that she used controlled substances.

15. Officer Hanson asked Williams if she had taken other trips with Cato, and she said that approximately three weeks earlier she and Cato went to Denver.

16. While Williams stayed in the vehicle and Cato stood with a backup officer, Officer Hanson deployed his dog, Falco. Falco immediately indicated to the odor of a controlled substance coming from the rear cargo/rear lift gate area. The dog indicated by barking repetitively, which is his primary aggressive indication.

17. Williams and Cato were placed with two backup officers during the resulting search of the vehicle. During the search, Officer Hanson seized several small pieces of marijuana between the front center console and the seats and in the center console cup area.

18. Officer Hanson continued the search in the rear cargo area, where he found two bags and a speaker box. The speaker box had wood screws that showed signs of "tooling," indicating that they had been manipulated recently.

19. Officer Hanson removed the speaker plate from the speaker box, and inside the box he found a vacuum-sealed package containing bundles of United States currency.

20. Officers transported the vehicle and its occupants to the police impound lot for a more thorough search and for interviews of Cato and Williams.

21. Officer Hanson opened the vacuum sealed bag at the impound lot, and inside the bag he found twenty-two individually rubber banded bundles of cash (the Defendant currency) ranging in denominations from $1.00 to $100.00. Each bundle, consisting of bills folded in half, included $1,000 in bills, and the total amount was $22,000.

22. At the impound lot, Officer Hanson conducted a "discretionary sniff" of the cash with Falco, which resulted in Falco indicating to the odor of drugs on the cash. Falco was deployed in an empty search bay away from the cash and officers laid out four new, clean cardboard boxes. He did not alert. After the cash was placed in one of the four boxes, Falco was deployed again and positively indicated to the odor of controlled substances in the box with the cash.

23. The Defendant property was seized. The Defendant property is in the judicial district of Nebraska and is being held by the United States Marshal's Service.

24. When Officer Hanson checked Cato's GPS, it showed Denver as Cato's destination.

25. Cato lives in Galesburg, Illinois, with different individuals. He does not pay rent.

26. Cato drives his mother's vehicle and does not pay for use of the vehicle.

27. Cato is divorced and has three young children who live with Cato's mother in Galesburg. He supports his children.

28. Cato has held a variety of jobs, and now works as a truck driver. He had an adjustable gross income of $17,651 in 2007, $13,381 in 2008, and $15,451 in 2009.

29. Cato's grandmother, Fannie Mae Cato-Pates, lives in Galesburg, Illinois. She has two freezers in her home. One freezer is in her garage, and the other freezer is in her basement.

30. Immediately after seizure of the Defendant property, the United States Drug Enforcement Administration began forfeiture proceedings.

31. The Plaintiff, the United States of America, filed a Complaint in this case against the Defendant property on January 26, 2010.

32. Cato filed a claim to the $22,000 with the United States Drug Enforcement Agency, and he answered the Complaint.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345, 1355 and 1395, and pursuant to 28 U.S.C. § 881. Venue in this district is proper under 28 U.S.C. § 1391.

2. The statutory bases for this lawsuit are 18 U.S.C. § 983 and 21 U.S.C. § 881.

3. 21 U.S.C. § 881(a)(6) provides in pertinent part for the forfeiture of "[a]ll moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . . all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any violation of this subchapter [I to chapter 13 of Tile 21 of the United States Code]."

4. The Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 983, provides that in a suit or action brought under a civil forfeiture statute for the civil forfeiture of any property:

>(1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture; [and]
>
>(3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.

18 U.S.C. §§ 983(c)(1) and (3).

5. The term " 'facilitate' encompasses 'activity making the prohibited conduct less difficult or "more or less free from obstruction or hindrance." ' " *United States v. Real Property Located at 3234 Washington Ave. N., Mpls., Minn.*, 480 F.3d 841, 843 (8th Cir. 2007) (quoting *United States v. Premises Known as 3639-2nd St., N.E., Mpls., Minn.*, 869 F.2d 1093, 1096 (8th Cir. 1989)).

6. Marijuana is a controlled substance. 21 U.S.C. § 812.

7. Specifically, in this case the government must establish by a preponderance of the evidence that the Defendant currency was substantially connected to drug trafficking, as required for civil forfeiture under 21 U.S.C. § 881(a)(6). *United States v. $117,920.00*, 413 F.3d 826, 829 (8th Cir. 2005).

8. Circumstantial evidence can be used by the United States to establish its burden of proof. *United States v. $84,615,* 379 F. 3d 496, 501 (8th Cir. 2004).

9. The government is not required to show evidence of, or trace the money to, a particular transaction. *United States v. U.S. Currency in the Amount of $150,660.00,* 980 F. 2d 1200, 1205 (8th Cir. 1992).

10.     Possession of a large amount of cash is strong evidence that the cash is connected with drug activity. *See, e.g., United States v. $124,700*, 458 F.3d 822, 826 (8th Cir. 2006).

11.     If the government meets its burden, in order to avoid forfeiture the Claimant has the burden of proving by a preponderance of the evidence that the Claimant is an innocent owner.  18 U.S.C. § 983(d)(1).

12.     An "innocent owner" is defined as "an owner who – (i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property."  18 U.S.C. § 983(d)(2)(A).

13.     The term "owner" does not include "a person with only a general unsecured interest in, or claim against, the property."  § 983(d)(6)(B)(i).

14.     Turning to this case, the Court finds Officer Hanson's testimony credible with the exception of his testimony regarding his perception that Cato's nervousness indicated possible criminal activity.  The Court's review of the recording of the traffic stop leads the Court to conclude that Cato was polite and composed throughout the traffic stop.

15.     The Court finds Ms. Cato-Pates's testimony very credible.

16.     The Court finds that Cato's testimony is not credible. Cato acknowledges that he gave Officer Hanson false information about his travel plans, and that he was actually traveling to Denver for a meeting about a prospective business venture.  The fact that Williams offered similarly false information independent of Cato suggests that the two conspired to prepare a scenario that would mislead law enforcement officers regarding their plans in the event that they were stopped.  The evidence of Cato's income during

2007, 2008, and 2009, together with evidence showing that Cato supports three children, is not consistent with his testimony that he saved $22,000 in cash.  The manner in which the Defendant currency was packaged and hidden in the vehicle; the drug dog's alert to Cato's vehicle and to the currency at the scene; and the drug dog's indication to the Defendant currency in a controlled environment at the impound lot, all support an inference that the cash was used in connection with a drug transaction.  Finally, Cato's testimony that he planned to use the money to purchase a truck and begin a business venture in Denver lacks any corroboration.

17. The United States has shown, by a preponderance of the evidence, that the Defendant property is substantially connected to drug trafficking.

18. Cato has not demonstrated by a preponderance of the evidence that he is an innocent owner of the Defendant property.

19. The Defendant property is forfeitable to the United States.

IT IS ORDERED:

1. The Defendant property shall be forfeited to the United States; and

2. A separate Judgment will be entered.

DATED this 16th day of November, 2010.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge